IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALLAN SAVIER TEJEDA MURILLO,

Defendant.

OPINION and ORDER

26-mj-4-amb

---

The State of Wisconsin prohibits noncitizens from voting in its statewide and federal elections.[1] It passed a statute that requires voters to be U.S. citizens, Wis. Stat. § 6.02(1), and, in 2024, its constitution was amended to incorporate this requirement, Wis. Const. art. III, § 1(2). Voting in violation of the requirement constitutes a state felony, Wis. Stat. § 12.13(1)(a), punishable with possible incarceration, Wis. Stat. § 12.60(1)(a).

It is Wisconsin's constitutional prerogative to adopt citizenship as a voter prerequisite. This right is expressly set forth in the U.S. Constitution—Article 1 Section 2 reserves to the states the power to set voter requirements for their federal elections. U.S. Const. art. 1, § 2, cl. 1. Consistent with this framework, the different states have adopted and amended various voter requirements throughout the nation's history, changing the contours of their electorates accordingly. One requirement that has seen some evolution is citizenship—many states, including Wisconsin, once allowed noncitizens to vote. Today, however, all states ban noncitizen voting in federal elections.

---

[1] In this opinion, "alien" and "noncitizen" are used interchangeably to refer to persons lacking U.S. citizenship.

Defendant Allan Savier Tejeda Murillo has been charged with unlawfully voting as a noncitizen in a federal election, but the ban he is alleged to have violated was not imposed by any state, it was imposed by Congress. In 1996, Congress enacted 18 U.S.C. § 611, which prohibits voting by "any" noncitizen, regardless of legal status, in "any" federal election. Violations of this statute constitute a Class A misdemeanor, punishable with possible incarceration. The problem with this statute is that Congress didn't have the power to enact it. The Constitution is clear that the states, and only the states, may set voter requirements. Congress cannot infringe that right.

Defendant has thus moved to dismiss the charge against him, arguing that § 611 is unconstitutional, both facially and as applied to him. Dkt. 15 & Dkt. 29. As explained further below, the court agrees with him on the as-applied challenge. Defendant may yet face prosecution for violating a state voter requirement—he may, for example, be charged in Wisconsin state court. But this prosecution, premised on a federal statute that exceeds Congress's limited authority, must be dismissed.

## JURISDICTION

Defendant, charged with a Class A misdemeanor, consented to be tried before a magistrate judge pursuant to 18 U.S.C. § 3401(b). Dkt. 23. The government subsequently petitioned to transfer the case to a district judge under 18 U.S.C. § 3401(f). Dkt. 33. After receiving input from both sides, the case was reassigned to District Judge William Conley for purposes of deciding the government's petition, Dkt. 41, and Judge Conley denied it, Dkt. 42. In light of the denial, the case, including defendant's motion to dismiss, has been returned to the originally assigned magistrate judge, Magistrate Judge Anita Marie Boor, for adjudication.

## BACKGROUND

The government alleges that defendant voted in the 2024 presidential election as a noncitizen and charged him in a one-count information with violating § 611(a). Dkt. 2.

Defendant has moved to dismiss the information, arguing that § 611 is unconstitutional on its face and as applied to him. Dkt. 15 & Dkt. 29. The parties have briefed these constitutional questions, with the government responding that defendant lacks standing, and regardless, the statute is supported by Congress's plenary power over immigration regulation and its authority to protect the integrity of federal elections. Dkt. 17 & Dkt. 18. The court heard oral argument on August 21, 2026. This case is set for trial on December 14, 2026.[2]

The parties also submitted supplemental briefing to address defendant's as-applied challenge, and defendant provided an amicus brief[3] filed by Attorney Paul D. Clement in *United*

---

[2] There are at least six other § 611 cases pending in this district. Defendant Christian Erazo Valdez has raised the same challenge to § 611 in Case No. 25-mj-148-amb, at Dkt. 20. The government has also charged defendants Jesus Javier Jurado Garcia, Julieta Engelstad, Monique R. Gignac-Yochum, Todd W. Malpass, and Robert Dedrick with violating § 611 in Case Nos. 26-mj-226-amb, 26-cr-102-jdp, 26-mj-245-amb, 26-mj-259-amb, and 26-cr-123-jdp, respectively. Engelstad and Dedrick are also charged with falsely claiming that they were citizens in order to register to vote in violation of 18 U.S.C. § 1015(f), a felony.

[3] The court invited the Wisconsin Department of Justice to file an amicus brief in this case, Dkt. 26, but received no response.

*States v. Cox*, Case No. 25-cr-60249 (S.D. Fla.), a Southern District of Florida case that involved similar constitutional challenges to the same statute.[4] Dkts. 27, 30, 31, & 32.

## LEGAL STANDARD

Defendant's motion requires the court to consider the interplay between the meaning of several constitutional provisions and § 611. Courts employ a "textual analysis" to determine the "normal and ordinary" meaning of constitutional provisions. *N. Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022). "The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood." *United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J., concurring). Guiding this analysis is the principle that "[t]he Constitution was written to be understood by the voters; its words and

---

[4] The court is aware of five out-of-district cases where similar motions to dismiss were filed. *United States v. Renaud*, Case No. 26-cr-20128 (S.D. Fla. Mar 31, 2026); *United States v. Cox*, Case No. 25-cr-60249 (S.D. Fla. Oct 22, 2025), *United States v. Sylvestre*, Case No. 26-cr-20081 (S.D. Fla. April 28, 2026), *United States v. Murray*, Case No. 26-cr-20104 (S.D. Fla. July 20, 2026), and *United States v. Bhengura*, Case No. 26-cr-314 (N.D. Tex. Sept. 11, 2026). In *Renaud*, the presiding judge denied defendant's motion without prejudice, and the defendant was found not guilty of the charge after a jury trial. *See* Dkt. 67 & Dkt. 73 in Case No. 26-cr-20128. The presiding judge in *Cox* granted the defendant's motion and dismissed the information, holding that § 611 was unconstitutional as applied to the defendant, and the government has appealed that ruling to the Circuit Court of Appeals for the Eleventh Circuit. *See* Dkt. 64 & Dkt. 65 in Case No. 25-cr-60249. In light of the *Cox* decision, and as of the date of this order, trial has been stayed in *Sylvestre* to allow the parties to consider a potential resolution. *See* Dkt. 54 in Case No. 26-cr-20081. The judge in *Murray* has reserved ruling on the defendant's motion to dismiss pending the Eleventh Circuit's disposition of the *Cox* appeal. Dkt. 31 in Case No. 26-cr-20104. Finally, the defendant in *Bhengura* sought leave to file a motion to dismiss two days before trial. *See* Dkt. 52 & Dkt. 54 in Case No. 26-cr-314. The court denied the motion to dismiss in a two-page order, noting that "Courts have applied the statute for years without questioning its validity," and the *Cox* decision was non-binding and insufficient to plainly show that Congress had exceeded its constitutional authority. Dkt. 61 at 2 in Case No. 26-cr-314.

phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention i[s] clear there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague*, 282 U.S. 716, 731 (1931); *see also District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *Sprague*, 282 U.S. at 731).

Similarly, when interpreting a statute, courts begin their analysis with the statutory text under the assumption that its ordinary meaning expresses the legislative purpose. *E.g.*, *Marshall v. Johnson*, 100 F.4th 914, 916 (7th Cir. 2024); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks and citation omitted)). At the core of this analysis is the "careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

If this examination "yields a clear answer, judges must stop." *Food Mktg. Inst.*, 588 U.S. at 436. Courts may consider congressional intent only if a statute is ambiguous. *Petr Tr. for BWGS, LLC v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1098 (7th Cir. 2024) (courts "turn to legislative history and other canons of statutory interpretation only if this language is ambiguous"). Even where a court consults legislative history to help shed light on ambiguous language, "ambiguous legislative history" cannot be used "to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).

ANALYSIS

Defendant argues that § 611 is facially unconstitutional because it sets a federal voter qualification that infringes on the power the U.S. Constitution reserves to the states to define their electorates. Dkt. 15 at 1. Acknowledging that the statute may be valid in places like the District of Columbia where there are no applicable state laws setting voter qualifications, defendant also raises an as-applied challenge based on the allegation that he voted in the State of Wisconsin, where he argues "the federal government cannot dictate a voter qualification." Dkt. 28 at 3.

The court begins and ends with defendant's as-applied challenge. *See United States v. Seiwert,* 152 F.4th 854, 860–61 (7th Cir. 2025) (to avoid "unnecessary constitutional issues," the court begins with the defendant's as-applied challenged and will "proceed to his facial challenge only if necessary"); *Doe v. Heck*, 327 F.3d 492, 527–28 (7th Cir. 2003) (courts should exercise judicial restraint and decide as-applied challenges before facial challenges); *Hatchett v. Barland*, 816 F. Supp. 2d 583, 608 (E.D. Wis. Sept. 14, 2011) (same, collecting cases).

The analysis unfolds in five parts. First, the court addresses standing and finds that the government's prosecution of defendant under § 611 constitutes sufficient injury for defendant to challenge the statute. Second, the court reviews the relevant provisions of the Constitution and concludes that the document expressly reserves to the states the power to set voter qualifications. Third, the court considers § 611 itself and finds that it infringes on this state power because it sets a uniform, national voter requirement, namely U.S. citizenship. Fourth, the court considers whether Congress's plenary powers provide a constitutional avenue for § 611 and concludes they do not because express reservations of state rights trump general plenary powers. Finally, the court declines to engage in the facial challenge.

### A. Defendant has standing to challenge § 611 as applied to him

As a threshold matter, the government suggests that defendant lacks standing to challenge the constitutionality of § 611. Generally, standing requires parties to show that they (1) have suffered or will imminently suffer a concrete and particular injury, (2) that is fairly traceable to the alleged conduct, and (3) would be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the hearing, the government essentially advanced a noninjury argument. It underscored that every state has enacted a ban on noncitizen voting,[5] and it contended that § 611 simply lays over top. Because § 611 is in keeping with the states' bans,[6] the government argued, this federal statute cannot cause defendant injury. The government also contended that defendant cannot assert a state sovereignty argument vicariously on the state's behalf.

But defendant is the object of the government's action—he is being prosecuted and faces criminal penalties if convicted of violating § 611. This fits the definition of an imminent, concrete and particularized injury. *See Bond v. United States*, 564 U.S. 211, 217 (2011) (Bond's

---

[5] By 1926, all states banned noncitizens from voting in state and national elections. Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the U.S.*, 19–20 tbl. 2.1 & 26–27 (2006). Arkansas was the last state to do so. *Id.* at 27; *see also* Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Pol. Sci. Rev. 114, 114 (1931). This includes the State of Wisconsin, which requires voters in federal and state-wide elections to be U.S. citizens, Wis. Stat. § 6.02(1), and criminalizes violations, *see* Wis. Stat. §§ 12.13(1)(a), 12.60(1)(a).

[6] Some municipalities allow noncitizen voting in certain local elections. For example, noncitizen parents, guardians and caregivers of children living in San Francisco may vote in school board elections. *See* S.F. Charter § 13.111 & § 1000.1; *see also Non-citizen Voting in Local Board of Education Elections*, SF.gov, https://www.sf.gov/non-citizen-voting-in-local-board-of-education-elections (last visited Nov. 5, 2026). And several municipalities in Maryland and Vermont allow noncitizen voting in municipal elections, including Barnesville, Maryland (town commissioner) and Montpelier, Vermont (city elections). Barnesville, Md. Town Charter, § 74–3; Montpelier, Vt. Charter, § 1501.

incarceration constitutes a concrete injury caused by the conviction and redressable by the invalidation of the conviction). That defendant could face criminal penalties for the same conduct in state court does not change the calculus. *See id.* at 223–24 (recognizing that "a litigant, in a proper case, [may] challenge a law as enacted in contravention of constitutional principles of federalism").

In short, defendant asserts injury (punishment upon conviction) from governmental action (this prosecution) taken in excess of the authority that federalism defines. In such a case, a defendant's "rights in this regard do not belong to a State." *Id.* at 220. The court will therefore consider the merits of defendant's as-applied challenge to § 611.

**B. The U.S. Constitution reserves the power of setting voter qualifications to the states**

The U.S. Constitution unambiguously reserves to the states the power to set voter qualifications in federal elections. To the extent it is necessary to look beyond the text, the document's contemporaneous history and court precedent confirm this point.

**1. Text**

The U.S. Constitution expressly authorizes the states, and only the states, to set voter qualifications for federal elections. It does so by tying the federal electorate to that chosen by each state for its own state legislature. Per Article 1, Section 2, members of the House of Representatives will be chosen every second year:

> [B]y the People of the several States, and
>
> [T]he Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

U.S. Const. art. 1, § 2, cl. 1 (breaks added for ease of reading).[7] James Madison explained the rule succinctly: "The electors . . . are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State." The Federalist No. 57, at 351 (James Madison) (C. Rossiter ed., 1961). The Constitution thus expressly reserves to each state the power to decide the "qualifications" of the people who can vote in federal elections held in that state. And in doing so, it rejects the notion that Congress could dictate a uniform voter qualification rule for the entire nation.

This is not to say that the federal government has no role to play in elections. The Suffrage Amendments, for example, provide for a limited federal role. These Amendments restrain the power of the states in setting voter qualifications by prohibiting them from denying any person the right to vote based on race, color, "previous condition of servitude," or sex, or a poll tax, or to anyone who is 18 years or older based on age. *See* U.S. Const. amends. XV, XIX, XXIV, XXVI. These same Amendments grant Congress the authority to enact laws to enforce these restrictions. *See South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966) ("Congress has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting.").

This framework allows Congress to check discriminatory disenfranchisement by the states. But it does not follow that Congress may affirmatively impose its own voter qualifications. "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854

---

[7] The Seventeenth Amendment copies this approach, providing that two senators will be elected from each state for six-year terms "by the people thereof," and "[t]he electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." U.S. Const. amend. XVII.

(2014). The authority to adopt measures to enforce certain constitutional guarantees does not also grant Congress "power to exercise discretion in the other direction" by restricting, abrogating, or diluting these guarantees. *Katzenbach v. Morgan*, 384 U.S. 641, 651 n.10 (1966); *see also City of Boerne v. Flores*, 521 U.S. 507, 519–520 (1997) (recognizing that the distinction between "measures that remedy or prevent unconstitutional actions and measures that make substantive change in the governing law" is apparent from the Constitution's text and "must be observed.").

The Elections Clause, too, provides for a limited federal role. Specifically, that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. States may regulate, among other things, voter registration, recounts, primaries, and the form and content of ballots. *League of United Latin Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135, 157 (D. D.C. April 24, 2025). Congress, meanwhile, has certain procedural powers in that it may "make or alter" regulations about when elections will be held, where they will be held, and how they will be held. U.S. Const. art. I, § 4, cl. 1.

At bottom, Section 2 of Article 1 explicitly says that the states get to decide the "who" of the electorate, so none of these other clauses can implicitly override that point. It is axiomatic that constitutional provisions cannot be read "as treating implicitly what these other constitutional provisions regulate explicitly." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013). The constitutional text is clear, making a review of history and case law unnecessary. But, for completeness, the review is below, and it only confirms the conclusion reached on text alone.

**2. History**

The contemporaneous historical record confirms the Framers were wary of giving Congress power over the electorate and decided that the states alone should chose voter qualifications. Per Alexander Hamilton, federal congressional authority "would be expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections" while voter qualifications "are defined and fixed in the Constitution, and are unalterable by the legislature." The Federalist No. 60, at 371 (Alexander Hamilton) (C. Rossiter ed., 1961) (emphasis in original).

This issue was the subject of a vigorous debate between Pennsylvania delegate Gouverneur Morris and other Framers at the 1787 Constitutional Convention that centered on whether property ownership should be a strict requirement for voting in federal elections. *See* 1 *The Records of the Federal Convention of 1787*, 5 (Max Farrand ed., 1911) (listing Morris as a representative of Pennsylvania).[8] Morris pushed hard for this requirement, warning that if they were to "Give the votes to people who have no property, . . . they will sell them to the rich who will be able to buy them." James Madison, *Notes of Debates in the Federal Convention of 1787 Reported by James Madison*, 402 (Ohio University Press, 1966) (1840). Morris moved to either limit suffrage to property holders or create a clause allowing Congress to alter voter qualifications. 2 *The Records of the Federal Convention of 1787,* 201, 207. But several other Framers opposed Morris, with George Mason objecting that the power to alter voter qualifications "would be a dangerous power in the hands of the Legislature" and James Madison agreeing that the right of suffrage "ought *not* to be left to be regulated by the Legislature." *Id.*

[8] The three volumes of the *Records* are available online through the Library of Congress, https://www.loc.gov/item/11005506/.

at 202–03 (emphasis added). Morris's motion died in the Committee on Detail by a vote of seven to one. *Id.* at 206.

States have exercised this power over the years, using voter qualifications to expand and contract the electorate as desired, with citizenship providing an example. While no state presently permits noncitizens to vote in federal or state elections, suffrage was not always tied to citizenship. *See* Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the U.S.*, 15, 19–20 tbl. 2.1 (2006) (the practice of noncitizen voting "came to a grinding halt in the early twentieth century"); *see also* Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Poli. Sci. Rev. 114, 114, 116 (1931). In the early Republic, noncitizen voting generally required only that voters be local residents or inhabitants who were not British citizens. *See* Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1399–1417 (1993) (recounting the history of alien suffrage in the early Republic). Similarly, early state laws allowed qualified "inhabitants" to vote rather than "citizens." Gerald M. Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote?*, 75 Mich. L. Rev. 1092, 1095–97 (1977). After the Civil War, states began restricting the right to vote to only citizens as anti-immigrant sentiment began to rise, and by 1900, "only eleven states retained noncitizen suffrage." David M. Howard, *Potential Citizens' Rights: The Case for Permanent Resident Voting*, 95 Tex. L. Rev. 1393, 1397 (2017).

Wisconsin has followed a similar trajectory. The Wisconsin Territory adopted a state constitution that gave noncitizens who declared their intention to apply for citizenship the right to vote, as did several other Northern states. Howard, 95 Tex. L. Rev. at 1396–1397; *see also* Wis. Const. art. III, § 1 (1848) (granting the right to vote to certain "citizens of the United States" and Native Americans, along with certain "persons of foreign birth who shall have

declared their intention to become citizens conformably to the laws of the United States on the subject of naturalization."). But this changed around the turn of the century. In 1908, the State of Wisconsin banned voting for noncitizens. Staci Duros & Richard Loeza, Legis. Reference Bureau, *Ballot Initiative and Referendum in Wisconsin*, Wis. Elections Project, vol. 1, no. 1, at 15 (2020) (noting that the proposed constitutional amendment was ratified). Today, Wisconsin law defines an "eligible elector" as a "U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote." Wis. Stat. § 6.02(1). A person who votes in Wisconsin without the "necessary elector qualifications" commits election fraud under state law, *see* Wis. Stat. § 12.13(1)(a), and risks a felony conviction, *see* Wis. Stat. § 12.60(1)(a). On top of this, in 2024, Wisconsin voters overwhelmingly approved a constitutional amendment banning all noncitizen voting in the state, even at the municipal level. *See* Wis. Const. art. III, § 1(2) (2026) ("Only a United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district who may vote in an election for national, state, or local office or at a statewide or local referendum.").

While the states are now aligned in their requirements that their voters be U.S. citizens, that is the practical effect of their individual choices not a result of a federal rule. If any state decided to change their approach, it constitutionally could. *See Minor v. Happersett*, 88 U.S. 162, 176–77 (1874) (validating the voting laws in nine states that allowed noncitizens to vote so long as they declared their intent to become U.S. citizens). These historical notes confirm that the states alone are empowered to decide their electorates.

### 3. Precedent

All this is to say that neither the constitutional text nor the relevant history "supports the view that Congress may set voter qualifications in federal elections." *Inter Tribal,* 570 U.S. at 17. Judicial precedent confirms this. Per the Supreme Court, the Elections Clause "empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them." *Id.* at 16. (emphasis in original). And the Supreme Court did not find support for congressional authority to impose voter qualifications in any other provision. *Id.*; *see also Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) ("Surely nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress") (Harlan, J., concurring in part and dissenting in part); *United States v. Cox*, Case No. 25-cr-60249-DSL, 2026 WL 2948729, at *8 (S.D. Fla. Oct. 1, 2026) (In *Inter Tribal*, "Justice Scalia, joined by five other Justices, dedicated hundreds of words to reject the idea that Congress can generally set voting qualifications for federal elections.").[9]

---

[9] Although the government relied on *Mitchell* to support the constitutionality of § 611 in cases in other districts, it has not done so in this court. *See, e.g.*, *Cox*, Case No. 25-cr-60249-DSL, at Dkt. 32 (S.D. Fla.); *Renaud*, 26-cr-201-28-JB, at Dkt. 28 (S.D. Fla.). At oral argument, the government confirmed that it was not asking this court to ground its ruling in *Mitchell*, and it distinguished *Mitchell* from this case as concerning the rights of citizens. *Mitchell* held that Congress could compel the states to allow 18-year-olds to vote in federal elections, but the opinion "lacked a majority rationale." *Inter Tribal*, 570 U.S. at 16 n. 8. Four of the five Justices who concurred in the *Mitchell* outcome relied on the Fourteenth Amendment, while Justice Black took the position that congressional power to prescribe the 18-year-old age qualification to vote derived from the Elections Clause. *Id.* (citations omitted). Justice Black was also the only Justice to conclude that Congress "has ultimate supervisory power" over federal elections, including "the age and other qualifications of the voters." *Mitchell*, 400 U.S. at 122–24. Notable here, "[f]ive Justices [in *Mitchell*] took the position that the Elections Clause did *not* confer upon Congress the power to regulate voter qualifications in federal elections." *Inter Tribal*, 570 U.S. at 16 n.8 (emphasis in original).

### C. Section 611 is a voter qualification

Turning to § 611 itself, the statute is not vague or ambiguous—a plain reading shows that it imposes a voter qualification. Like the constitutional analysis above, should a review of legislative history or case law be necessary, they confirm this point.

#### 1. Text

Section 611 prohibits voting by "any" noncitizen, regardless of legal status, in "any" federal election and punishes violations with possible imprisonment:

> (a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless—
>
> the election is held partly for some other purpose;
>
> aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
>
> voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

18 U.S.C. § 611(a).

This language says "who" can vote, which is the definition of a voter qualification. *See Inter Tribal*, 570 U.S. at 16 (the Elections Clause "empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."); *see also Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 136 (3d Cir. 2024) (voter qualification rules are about who is entitled to vote). The "unless" clause, which carves out noncitizens who vote in an election for state or local office, "shows that Congress clearly meant to prohibit an alien

from voting in a federal election, even when permitted by state law." *Cox,* 2026 WL 2948729, at *12.

The government disagrees with this seemingly straightforward proposition. It argues that § 611 is an immigration law that protects against voter fraud. While Congress inarguably has broad authority in these areas, a plain reading of § 611 reveals it does not fall within them.

Before reengaging with the language of the statute, the court acknowledges the government's points and uses them to frame the analysis. It is beyond question that Congress has broad, plenary power over immigration and naturalization. The Constitution grants Congress the power to set uniform rules for naturalization. U.S. Const. art. I, § 8, cl. 4. Congress thus has the power to regulate: (1) the "entry of aliens and their right to remain here," *Galvan v. Press*, 347 U.S. 522, 531 (1954); as well as (2) the standards for citizenship, *Fiallo v. Bell*, 430 U.S. 787, 799–800 (1977) (upholding sections of the Immigration and Nationality Act of 1952 granting special preference immigration status to aliens who qualify as the parent or child of a U.S. citizen or lawful permanent resident). These broad powers are "largely immune from judicial control." *Fiallo*, 430 U.S. at 792; *see also Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (the admission and exclusion of foreign nationals is a judgment "frequently of a character more appropriate to" the other branches); *Arizona v. United States*, 567 U.S. 387, 394 (2012) (the federal government "has broad, undoubted power over the subject of immigration and the status of aliens."). Congress also has the power to regulate other aspects of noncitizens' lives. For example, Congress may deny benefits to noncitizens that are otherwise available to citizens. *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 69 (1976) (upholding a federal law that restricted certain noncitizens' eligibility for a medical insurance program based on the duration of their residence and on their admission for permanent residence); *see also City of Chicago v.*

*Shalala*, 189 F.3d 598, 604–05 (7th Cir. 1999) (upholding a federal law denying welfare benefits to noncitizens).[10]

As broad as these powers are, they do not correspond to what § 611 does. The statute does not regulate who can enter the country. It does not say who can stay or who must leave. Nor does it set any standards for citizenship. In contrast, there are other statutes that cleanly execute the power to regulate immigration and affect noncitizen voting. The false claims statute, 18 U.S.C. § 1015(f), criminalizes knowingly falsely claiming citizenship in registering to vote. Beyond that, 8 U.S.C. § 1182(a)(10)(D)(i) renders inadmissible any noncitizen who has voted unlawfully, while 8 U.S.C. § 1227(a)(6)(A) renders such noncitizens deportable. *See Fitzpatrick v. Sessions*, 847 F.3d 913, 914–15 (7th Cir. 2017) (declining to estop the federal government from removing a noncitizen who had voted in a federal election under 8 U.S.C. § 1227(a)(6)). But § 611 expressly says who can vote, which is categorically a voter qualification.

---

[10] Defendant takes a big swing at what he characterizes as Congress's unlawful exercise of general police power over noncitizens' conduct, taking particular issue with the government's reliance on *Shalala* to make its contrary point. *See* Dkt. 15 at 2 ("Congress lacks a police power"); Dkt. 17 at 3 (relying on *Shalala* for the proposition that Congress has plenary authority to "proscribe conduct of noncitizens" and to "punish non-compliance with criminal penalties"); & Dkt. 18 at 9–12 ("Congress lacks a police power over aliens"; "The Court should reject the government's theory of a general police power over aliens"). The court agrees that the government's characterization of *Shalala* is inapt. Contrary to the government's suggestion, *see* Dkt. 17 at 3 (plenary power includes the authority to proscribe conduct of noncitizens, including voting), *Shalala* is not a voting case. But defendant's police power argument itself is a stretch. *See, e.g.*, *United States v. Carbajal-Flores*, 143 F.4th 877, 889 (7th Cir. 2025) (upholding a federal law excluding noncitizens who are illegally or unlawfully in the United States from possessing a firearm). That said, the court does not need to reach this issue to resolve defendant's motion. It is enough to say that § 611 imposes an unlawful voter qualification.

Likewise, Congress has the power to prevent fraud and corrupt practices in congressional elections. Thus, Congress has the "authority to provide a complete code for congressional elections," including "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

But § 611 does not implicate this fraud prevention power either. It does not provide for election notices or voter registration. It does not concern supervision of voting, protection of voters, counting votes, or publishing election returns. Nor does it concern inspectors or canvassers. It bans noncitizens from voting, regardless of their legal status. As noted above, there is a long history of states allowing noncitizens to lawfully vote in federal elections, so there is nothing inherently fraudulent about this activity. In short, issuing a blanket ban on noncitizen voting isn't a direct approach to tamping down on fraud or fighting corrupt practices.

The statutory text is clear, making a review of the legislative history or precedent unnecessary, but any such review only confirms the conclusion.

**2. Legislative History**

Section 611 forms part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, div. C, 110 Stat. 3009–546, *et. seq*. The Act was divided into broad sections organized around several goals, including: (1) to improve deterrence of illegal immigration by increasing border patrol, increasing penalties for smuggling, reforming deportation procedures, improving border security equipment and technology, and improving employment verification systems; (2) to reform the legal immigration system and

facilitate legal entries through other measures; and (3) to improve interior enforcement by increasing investigators and using state services to carry out immigration enforcement. *See* 110 Stat. at 3009–546 to 553. Section 611 does not implicate border patrols, smuggling, deportation, employment verification, investigators, or state enforcement services. Seemingly adrift from the overarching goals of the Act, it was placed in the section of the statute concerning the deterrence of document fraud, *see* 110 Stat. at 3009–569, 572.

Digging deeper, the motivation for § 611 reveals itself to be a desire to ensure that citizens, and only citizens, decide federal elections. Senator Alan Simpson, a chief sponsor of the IIRIRA and § 611's drafter, explained that it would be unacceptable for "a small group of citizens" to "outvote a citizen majority, if the group had enough non-citizen allies," and the amendment "would help guarantee that a majority of citizens of the United States, those who owe their full political allegiance to this country, retain political control of every political unit and every political issue." 142 Cong. Rec. S4018–S4019 (1996) (statement of Sen. Alan Simpson). These remarks bolster the textual analysis above: Section 611 sets a voter qualification because it was designed to shape the federal electorate.

Senator Simpson did tie § 611 to some immigration functions. He emphasized that the amendment would: (1) create a criminal penalty for voting by noncitizens in any federal election; (2) create a ground for the "exclusion for aliens" who unlawfully voted; and (3) create a ground for their deportation. *Id.* at S4018. He also suggested that the amendment would encourage naturalization. *Id.* at S4019. Perhaps so, but these points seem incidental to the remarks relayed above. In any event, a senator's stated purpose, however legitimate, cannot paper over otherwise unconstitutional excesses of authority. *FS Credit Opportunities Corp. v.*

*Saba Cap. Master Fund, Ltd.*, 608 U.S. 608, 621 (2026) ("fundamental precept" that "the intentions of legislators" do not govern) (citation omitted).

**3. Precedent**

There is no precedent deciding the issue before the court. It is worth noting, however, that the one written decision the court could find on the issue concluded that the statute is unconstitutional for the same reasons as here. *See Cox,* 2026 WL 2948729, at *1 (concluding that "the text, structure, and original public meaning of the Constitution show that *Congress does not have the constitutional power to enact*" § 611 (emphasis in original)); *but see United States v. California*, Case No. 26-7231, 2026 WL 3268272, at **9–12 (9th Cir. Oct. 30, 2026) (Bumatay, J., dissenting) (concluding that § 611(a) is an Elections Clause statute that preempts California from knowingly sending vote-by-mail ballots to individuals the federal government has identified as likely noncitizens and then counting those ballots in violation of § 611).

**D. Congress cannot rely on its plenary power to usurp authority reserved to the states**

Even if the court assumes that § 611 falls withing Congress's plenary powers, that would not resolve the constitutional problem at the heart of this case. The statute still impinges on a power expressly reserved to the states. And when there is a conflict between general plenary powers and expressly reserved powers, the express powers win.

The Constitution creates a federal government of limited enumerated powers. *See* U.S. Const., art. I, § 8. Certainly, "[t]he power of the Federal Government is to be respected," but "the States remain sovereign as to all powers not vested in Congress or denied them by the Constitution." *Garcia v. S. A. Metro. Transit Auth.*, 469 U.S. 528, 550 (1985); *see also United States v. Lopez*, 514 U.S. 549, 567 (1993) (declining to convert "congressional authority under the Commerce Clause to a general police power of the sort retained by the States"); *Seminole*

*Tribe of Florida v. Fla.*, 517 U.S. 44, 76 (1996) ("The Eleventh Amendment prohibits Congress from making the State of Florida capable of being sued in federal court.").

This principle applies even in the area of immigration, where, as noted above, congressional authority is broad. For example, in *Zadvydas v. Davis*, the Supreme Court held that the federal government cannot indefinitely detain noncitizens who have a final order of removal if no country will accept them. 533 U.S. 678, 690 (2001). In reaching that conclusion, the Court explained that Congress's plenary power over immigration law "is subject to important constitutional limitations" and that Congress must employ a constitutionally permissible means of implementing its power. *Id.* at 695.

Simply put, Congress may exercise its broad authority over immigration in ways that respect how the Constitution has allocated power between it and the states. But even congressional plenary powers "cannot override foundational constitutional constraints," *Haaland v. Brackeen*, 599 U.S. 255, 276 n.3 (2023) (brackets omitted), such as those on establishing voter qualifications that "sprang from the Framers' aversion to concentrated power," *Inter Tribal,* 570 U.S. at 17.

On a final note, the government argued in its response and at oral argument that the application of § 611 is constitutional, or that the court should avoid the constitutional question altogether, because Wisconsin, like all states, presently bans noncitizen voting. There are two ways to interpret this argument. The first is to see it as a challenge to standing, but the court has resolved that question in defendant's favor, discussed above. The second is to take it as an argument of statutory construction, essentially tying § 611 to an underlying violation of state law. But this latter argument reads requirements into the statute that are not there. Again, the statute prohibits "any" noncitizen from voting in "any" federal election. While the "unless"

clause carves out a narrow exception for noncitizen voting in non-federal elections, it does nothing to dispel the notion that a defendant could still violate § 611 by voting in a federal election, even when permitted under state law.

Because § 611 cannot be read in the way the government proposes, the court cannot avoid the constitutional question altogether. Although federal statutes are presumed constitutional, and the court should determine whether a construction that avoids a constitutional question is "fairly possible" when serious doubt of their constitutionality arises, "this cannon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986); *see also Aptheker v. Sec'y of State*, 378 U.S. 500, 515 (1964) (the court will construe legislation to save it against constitutional attack, but it will not take this task to the point of perverting a statute's purpose).

**E. The court need not reach defendant's facial challenge**

Defendant also raises a facial challenge to the statute, but the court need not reach the question. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 683, 688 n.5 (7th Cir. 1998) (if an as-applied challenge is successful, the court need "not conduct further proceedings concerning the facial challenge"); *see also United States v. Popa*, 187 F.3d 672, 678 (D.C. Cir. 1999) (vacating the defendant's conviction because his as-applied challenge was successful and declining to "go on to inquire whether the statute is overbroad and, if so, whether it is susceptible to a limiting construction").

Facial challenges are "hard to win" because claims of facial invalidity are often speculative and "threaten to short[-]circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice, LLC*, 603 U.S. 707,

723 (2024) (internal quotation marks and citations omitted). Outside the First Amendment context, a plaintiff must establish that no valid set of circumstances exists under the law, or that the law lacks a "plainly legitimate sweep" to succeed. *Id.; see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge requires the movant to establish that no set of circumstances exists under which the statute in question would be valid); *United States v. Reyna*, 165 F.4th 1056, 1059 (7th Cir. 2026) (same). Because a successful facial challenge results in the invalidation of a statute in all its applications, it is "strong medicine" employed by courts "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citation omitted).

At oral argument, defendant stated that he was not abandoning his facial challenge, but he acknowledged that the court need not reach it if the court granted him relief on his as-applied claim. Accordingly, the court will not conduct unnecessary constitutional inquiries and declines to reach defendant's facial challenge. *See Commodity Trend Serv.,* 149 F.3d at 683 (the court need "not conduct further proceedings concerning the facial challenge" where the as-applied challenge is successful).

ORDER

IT IS ORDERED that:

1. Defendant Allan Savier Tejeda Murillo's motion to dismiss the information, Dkt. 15, is GRANTED and the information is DISMISSED.

2. The government may appeal this ruling to a district court judge in compliance with Federal Rule of Criminal Procedure 58(g)(2)(A) and 18 U.S.C. § 3731.

Entered November 6, 2026.

BY THE COURT:

/s/

ANITA MARIE BOOR
Magistrate Judge